**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DAVID MACDONALD,

     Plaintiff,

v.                                          Case No. 19-12183

CITY OF DETROIT,
DETROIT BUILDING AUTHORITY,
and DETROIT LAND BANK AUTHORITY,

     Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION TO FILE AN AMENDED COMPLAINT**

**I. INTRODUCTION**

Plaintiff David MacDonald sues Defendants City of Detroit (the "City"), Detroit Building Authority ("DBA"), and Detroit Land Bank Authority ("DLBA") alleging constitutional violations stemming from Plaintiff's involvement in the Detroit Demolition Program ("DDP" or the "demolition program"). Before the court are three motions for summary judgment, one filed by each Defendant, and a motion by Plaintiff to amend his complaint to reassert a dismissed equal protection claim. The motions have been fully briefed, and the court concludes that a hearing is not necessary. *See* E.D. Mich. 7.1(f)(2). For the reasons stated below, the court will grant Defendants' motions for summary judgment and will deny Plaintiff's motion to file an amended complaint.

## II. BACKGROUND

### A. Factual History

In 2014, Detroit Mayor Mike Duggan initiated the demolition program to help combat blight within the City by demolishing abandoned houses. (ECF No. 17, PageID.161.) The demolition program is administered by the DLBA, which is overseen by the DBA. (*Id.*) The program relies on demolition contractors and requires contractors to test and remediate homes for asbestos prior to demolition. (*Id.* at 162.)

Once a contract has been awarded to a demolition contractor, either the City or the DLBA will issue a Notice to Proceed, and the specific house is scheduled for asbestos abatement. (*Id.*) A cloud-based application created by Salesforce tracks the asbestos abatement process. (*Id.*) Every property targeted by the demolition program has a unique Salesforce webpage, and all parties involved in the demolition process can access the Salesforce website for each individual house. (*Id.*)

After the abatement sub-contractor completes its work, the house is scheduled for a "post abatement verification" inspection. (*Id.*) When the inspector completes the post abatement inspection, he uploads his report to the Salesforce webpage. (*Id.*) If the inspector's report indicates that the asbestos has been totally abated the demolition contractor may schedule a demolition date for the house, also referred to as a "planned knock date." (*Id.* at 163.) The demolition contractor must enter the date of the actual demolition into Salesforce, along with the date on which the remnants are hauled away, and the date on which the lot is backfilled. (*Id.* at 164) A final inspection occurs after the grading to determine whether the demolition was properly completed. (*Id.*)

In August 2017, Plaintiff began working for Den-Man contractors, a demolition contractor who often completed City residential demolition projects. (*Id.* at 164-65.) While employed at Den-Man, Plaintiff "was critical" of another contractor, BBEK Environmental and its owner, Kevin Woods, for their handling of asbestos abatement work for the program. Specifically, Plaintiff states that he criticized the DBA's reliance on Woods's advice and alleged that Woods was gaining a monopoly in the abatement work. (ECF No. 61-3, PageID.1759.) Woods has since been banned from the demolition program for falsifying Asbestos Clearance Reports and is currently being prosecuted by the Michigan Department of Environmental Quality.

Plaintiff says he first voiced his concerns about BBEK Environmental to Defendants in "June or July 2017" and that he continued to make such complaints at contractor meetings almost weekly between January or February 2018 through his termination in November 2018. (*Id.* at 1760, 62.) But during their depositions, none of the DBA employees who Plaintiff allegedly complained to, specifically remembered Plaintiff's complaints about Woods at the weekly contractor's meetings. (*Id.* at 1782, 1789-90, 1796, 1800) One DBA employee, Thomas Fett, who was present at the meetings, stated that "I actually thought that [Plaintiff and Woods] were kind of tight." (*Id.* at 1800.) While Plaintiff states that most of his complaints about Woods were verbal, he was able to produce two, undated text messages he sent to DBA employees complaining about Woods. (ECF No. 73-5, PageID.2858 (informing Fett that Woods had chosen to work on abatement projects in Flint and Monroe, Michigan that week because he wasn't being paid fast enough by the DBA); *Id.* at 2861 (warning DBA employee Tim Palazzolo that "Kevin [Woods] is Bus driving the shit out of you with Tammy Daniels" (a

high ranking DBA executive) by providing Daniels with "two page justification[s]" defending change orders that Woods sought).)

On March 5, 2018, Den-Man hired Renee Alter as an administrative assistant. She was eventually tasked with scheduling demolition work for Den-Man. As Den-Man's demolition project manager, Plaintiff stated that he directly co-supervised Alter. (ECF No. 61-3, PageID.1757.) Several months later, Den-Man also hired Dennis Kolorov to manage backfilling operations. (ECF No. 17, PageID.166.)  Shortly thereafter, Plaintiff began looking for other employment. (*Id.*) Plaintiff asserts that much of his responsibilities were transitioned to Alter on September 10, 2018, but also alleges that he continued to manage backfilling operations for Den-Man as of September 17, 2018. (ECF No. 17, PageID.166–68.)

Documents produced during discovery show that BBEK Environmental sent Plaintiff an email on August 30th, 2018 with an attached spreadsheet indicating the abatement status of various houses set to be demolished by Den-Man (ECF No. 63-3, PageID.2097-100.) The spreadsheet listed 14444 Flanders as "on hold… DO NOT WRECK." (*Id.* at 2100.) On September 10, 2018, Alter texted a list of houses scheduled to be demolished that week to Plaintiff, which included a house located at 14444 Flanders. (ECF No. 17-2, PageID.187.) The house at 14444 Flanders contained unabated asbestos. (ECF No. 17, PageID.167.) According to Plaintiff, had Alter entered the address into the Salesforce website pursuant to the City's policy, Salesforce would not have allowed a demolition date for 14444 Flanders to be scheduled. (*Id.*) However, the property was not entered into Salesforce prior to demolition, and 14444 Flanders

was demolished on September 13, 2018. (*Id.* at 168.) Plaintiff asserts that he had no

involvement in the decision to demolish 14444 Flanders. (*Id.*)

Approximately one hour after the demolition, Alter informed Plaintiff that 14444

Flanders had not yet been abated for asbestos before demolition. Plaintiff "immediately"

advised David Holman of Den-Man that the property had not been properly abated. (*Id.*)

Holman reported the incident to the DBA in an email dated October 26, 2018. The email

reads as follows:

> I regret to inform you that the 1444[4] Flanders [m]ay have been wrecked
> and completed without removal of asbestos.
>
> David Macdonald [sic] who was in charge of my demolition operation and
> scheduling demolished this house on 9-13-18. His last day of work was 9-
> 14-18. I have no knowledge of any abatement work that was done prior to
> demolition.
>
> I was unaware that this job was scheduled or completed until after [D]ave
> [M]c[D]onald had left.

 (ECF No. 17-5, PageID.233.)

On October 30, 2018, Fett prepared an initial factfinding report for the DBA on

the Flanders demolition. (*See* ECF No. 17-6, PageID.234.) The report found that

Plaintiff had been informed of the property's status by BBEK Environmental prior to its

improper demolition, and it cited Holman's email laying the blame for the improper

demolition at Plaintiff's feet because "[Plaintiff] was in charge of the demolition," (*Id.* at

237-38.) The report expressly stated that "[d]ue to the severity of what the facts seem to

indicate, I did not contact [Plaintiff]" as part of the preliminary investigation. (*Id.* at 238.)

Plaintiff began working for another contractor, Smalley Construction, on

September 17, 2018. In response to the October 26 email from Holman, the Deputy

Director of the DBA, Timothy Palazzolo, issued a stop-work order to Smalley

5

Construction, Plaintiff's new employer. (ECF No. 17-7, PageID.240). Attached to the

stop-work order was a letter dated November 6, 2018, from the Director and Health

Officer of the City's Health Department, Joneigh S. Khaldun. In relevant part, the letter

stated:

> It has come to my attention that a home located at 14444 Flanders in the
> City of Detroit was demolished without proper environmental abatement. I
> am [sic] receipt of documentation indicating that Mr. David MacDonald—
> then employed by Den-Man construction—either ignored or overlooked
> explicit instructions from an abatement contractor that stated the following
> in regards to 1444 Flanders: "DO NOT WRECK" and "bad survey."
> . . .
> Accordingly, pursuant to my authority to issue "rules and polices
> necessary for enforcement" of any laws pertaining to "public health and
> safety" (*see* Detroit City code 24-1-1.2), I am hereby declaring that it is the
> policy of the City of Detroit Health Department that no demolition within
> the City limits shall be conducted by any company, firm, or LLC that
> employs Mr. David MacDonald in a demolition-related capacity. This policy
> is effective immediately, and shall remain in effect until rescinded by me.

(ECF No. 17-7, PageID.253.)

The letter was sent to all contractors involved in demolition work in the DBA's program.

(ECF No. 17, PageID.169.)

Dr. Khaldun was not deposed by the parties as part of discovery. Plaintiff states

that because Khaldun is now serving as the State of Michigan's Chief Medical Officer,

directing the state's Covid-19 response, he respected her office's request "that she not

be deposed at this time." (ECF No. 70, PageID.2442.) Consequently, the record does

not contain a firsthand account of what evidence was considered as part of her

decision.

Brian Farkas, a DBA executive, stated during his deposition that from the DBA's

perspective there was additional evidence indicating a pattern of misconduct by the

Plaintiff. (ECF No. 61-6, PageID.1779.) He stated that "in my time here in the program, I

don't think we've ever seen an individual cause problems with various different contractors the way [Plaintiff] did." (*Id.* at 1781.) Farkas recounted three separate events involving Plaintiff that allegedly occurred while he worked at different contractors. (*Id.* at 1779.) The "problems" included: (1) the use of racial slurs directed at DBA workers by an employee who worked for Plaintiff, (2) an incident involving the illegal dumping of demolition debris that Plaintiff purportedly directed through text-messages later obtained by the DBA, and (3) Plaintiff was "in charge" of a contractor's demolition program when doctored photos were submitted to make it appear that a broken city sidewalk had been properly repaired. (*Id.* at 1779, 1783.)

Plaintiff claims that he was not afforded a hearing prior to the issuance of a stop-work order, which he claims violated the DBA's contractor discipline policy. (*Id.*) Additionally, Plaintiff alleges that neither the DBA or the DLBA even contacted him prior to issuing the stop-work order. (*Id.*)

On November 29, 2018, Plaintiff entered into a voluntary separation agreement with Smalley Construction. (ECF No. 17-11.) Thereafter, he filed the instant lawsuit.

## B. Procedural History

Defendants previously moved to dismiss all four counts in Plaintiff's amended complaint, and this court found that Plaintiff's Due Process (Count I) and Invasion of Privacy (Count IV) claims should be dismissed with prejudice. *See MacDonald v. City of Detroit*, 434 F. Supp. 3d 587 (E.D. Mich. 2020). The court also dismissed Plaintiff's Equal Protection claim (Count II) without prejudice because "Plaintiff has not sufficiently alleged the existence of a comparator" and has failed to allege that the government's actions lacked a legitimate purpose "or demonstrate that the actions were motivated by

animus or ill-will." *Id.* at 598 (quotations omitted). Finally, the court declined to dismiss Plaintiff's First Amendment retaliation claim (Count III). *Id.* at 599. Defendants now seek summary judgment on the outstanding claim, (*see* ECF Nos. 60, 63, 64), while Plaintiff seeks to amend the complaint to reinstate his equal protection claim, (ECF No. 62). The court will now address these outstanding motions.

## III. FIRST AMENDMENT RETALIATION CLAIM

### A. Summary Judgment Standard

Summary judgment is appropriate when there exists no dispute of material fact and the moving party demonstrates entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers all evidence, and all reasonable inferences flowing therefrom, in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). The court may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment, only the finder of fact can make such determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to set forth enough admissible evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S.

at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all

factual disputes are material. A fact is "material" for purposes of summary judgment

when proof of that fact would establish or refute an essential element of the claim "and

would affect the application of the governing law to the rights of the parties." *Rachells v.*

*Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

### A. Discussion

The court begins by addressing Defendants' motions for summary judgment as

to Count III. (ECF Nos. 60, 63, 64) Defendants' arguments largely overlap, so unless

otherwise specified, the court analyzes Defendants' arguments together.

To state a claim for first amendment retaliation, Plaintiff must allege that: "(1) [he]

engaged in protected conduct; (2) an adverse action was taken against [him] that would

deter a person of ordinary firmness from continuing to engage in that conduct; and (3)

there is a causal connection between elements one and two—that is, the adverse action

was motivated at least in part by [his] protected conduct." *Maben v. Thelen*, 887 F.3d

252, 264 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir.

1999) (en banc)). At the motion to dismiss stage, Defendants previously argued that

Plaintiff's claim, as pleaded, failed to meet all three elements required for a first

amendment retaliation claim. This court rejected these arguments. *See MacDonald*, 434

F. Supp. 3d 599-600.

First, this court found that Plaintiff's criticism of BBEK Environmental's handling

of abatement work was a matter of public concern because "[p]roper asbestos

remediation in residential areas is a matter of public concern [as] it impacts the health

and safety of the community." *Id.* at 599. And criticism of other contractors did not fall

9

within Plaintiff's "'official duties' as an employee of a private company." *Id.* Second, this court found that a "policy, which restricted Plaintiff's employment options. . . squarely falls within the scope of adverse actions previously recognized by the Sixth Circuit." *Id.* at 599-600. Finally, this court found that Plaintiff had sufficiently pleaded causation at the motion to dismiss stage because "[t]he timing between Plaintiff's criticisms of BBEK Environmental and Defendants' alleged retaliatory conduct will be relevant [only] at the summary judgment stage." *Id.* at 600. Defendants' motions for summary judgment largely renew their challenges against all three elements. (*See e.g.* ECF No. 60, PageID.1662-1671.) Now that the factual record has been more fully developed, Defendants request that the court revisit its initial conclusions. After conducting such a review, the court finds that Defendants should be awarded summary judgment on this count.

### 1. Protected Conduct

The court determines as a matter of law whether the Plaintiff engaged in constitutionally-protected speech. *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). Where the plaintiff is a public employee, the plaintiff must meet three requirements to establish that his speech is protected: (1) the employee's speech must relate to a matter of public concern, *see Connick v. Myers*, 461 U.S. 138, 143 (1983); (2) if the employee's speech relates to a matter of public concern, the employee's interest "in commenting on matters of public concern ... [must] outweigh[ ] the employer's interest in promoting the efficiency of the public services it performs through its employees," *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); and (3) the employee's speech must not be made "pursuant to ... official duties," *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). These

three requirements—the "public concern," "balancing," and "pursuant to" requirements—must all be satisfied for a public employee's speech to be protected. *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 338 (6th Cir. 2010). While these precedents involved government employees, the United States Supreme Court has found this same framework should also be applied to first amendment retaliation claims brought by government contractors. *See Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 678 (1996). ("We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors.").

An individual's speech addresses a matter of public concern when it "involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (internal quotation and citation omitted). "Whether [a Plaintiff's] speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Accordingly, the Sixth Circuit employs the "focus" test in determining whether speech touches on a matter of public concern. *Farhat*, 370 F.3d at 592. The court looks to the point or focus of the speech in question and what the speaker intended to communicate based on "the complete record." *Id.* Even speech in private conversations can be entitled to protection when the focus is a matter of public concern. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543-44 (6th Cir. 2012).

11

In his complaint, Plaintiff alleges that he repeatedly voiced his criticisms about abatement sub-contractor BBEK Environmental "for their handling of the asbestos abatement portion of the demolition projects." (ECF No. 17, PageID.165.) And, Plaintiff also notes that BBEK and its owner Kevin Woods was "subsequently. . . banned from the DDP for falsifying Asbestos Clearance Reports" and is being "prosecuted" for a violation by "the Michigan Department of Environmental Quality." (*Id.*) Based on these pleadings, at the motion to dismiss stage, the court concluded that proper "handling" of "asbestos remediation in residential areas is a matter of public concern" under *Connick* so Plaintiff's speech on this matter would constitute protected conduct. *MacDonald*, 434 F. Supp. 3d 599.

Defendants now argue that Plaintiff's criticisms of BBEK Environmental, as Plaintiff explained in his deposition, do not actually constitute a matter of public concern. (ECF No. 60, PageID.1662-64. ("[T]he complaints lodged by the Plaintiff are not of alleged wrongdoing or breach of public trust, but merely that another party within the program was listened to and that a company was growing.").) The court agrees. Plaintiff's deposition testimony, and the text messages he has produced during discovery, make clear that, despite the allegations made in the initial complaint, Plaintiff's criticism of BBEK and its owner were not focused on its actual methods of abatement, follow-up testing, or other illegal conduct.

Instead, in his deposition Plaintiff stated he repeatedly expressed two main lines of "criticisms" regarding BBEK. First, Plaintiff testified that he complained on multiple occasions during weekly demolition contractors' meetings that as "scrutiny on asbestos abatement increased from the State of Michigan. . . Kevin Woods [of BBEK] was

12

gaining more influence with members of the Detroit Building Authority and they were listening to him." (ECF No. 70-4, PageID.2473.) And second, Plaintiff testified that he repeatedly complained how "other asbestos abatement contractors [had become] disinclined to bid the [DBA] work because of this [sic] complexity and scrutiny with the State of Michigan" resulting in BBEK "doing 80 to 90 percent of all the abatement work in the program for all the different demolition contractors." (ECF No. 70-4, PageID.2473.) Plaintiff also produced two text threads where Plaintiff complained to DBA employees about BBEK's attempts at obtaining faster (and increased) payment for its abatement work. (*See* ECF No. 73-5, PageID.2858, 2861.)

Reviewing the whole record, it becomes clear as a matter of law that Plaintiff's complaints focused on advancing Dem-Man's interests as a contractor. *See Farhat*, 370 F.3d at 592. First, the forum and context of Plaintiff's two complaints are factors that lean against these two complaints being considered matters of public concern. *See Connick*, 461 U.S. at 147-48. The complaints were made in the context of weekly DBA contractors' meetings where participants regularly "complained about each other and everything," (ECF No. 61-6, PageID.1783), and through other private conversations (and text exchanges) with DBA staff. Plaintiff did not air his complaints in a public board meeting, through the media, or in some other public forum.

The actual content of the complaints raised by Plaintiff, as revealed by discovery, also does not evince a matter of public concern. The revelation that the DBA chose to rely increasingly on BBEK's expertise in complying with state oversight, as opposed to other contractors such as Den-Man, "if released to the public, would convey no

information at all other than the fact that a single [contractor] is upset with the status quo." *Connick*, 461 U.S. at 148.

Similarly, Plaintiff's complaint that BBEK controlled a large share of the abatement market in the demolition program was not primarily focused on a matter of public concern, in fact, it was a complaint based primarily in self-interest. It is the individual demolition contractors biding on residential demolitions, not the DBA itself, who decides which abatement subcontractor to use when bids are submitted for a City demolition. (*See* ECF No. 61-6, PageID.1782.) In his deposition, Plaintiff listed at least four abatement sub-contractors that did work on DBA funded projects but explained that BBEK was the largest. (ECF No. 61-3, PageID.1759.) And he described how it was hard to get "anyone else to work with us" because "anyone else that wanted to enter [the market] would have to have a much larger administrative staff and field staff and oversight staff" to comply with the program's requirements. (ECF No. 61-3, PageID.1759.)

This context makes clear that the primary focus of this complaint was Plaintiff's own interest as a government contractor who would (rationally) want a more competitive subcontractor market to increase Den-man's own leverage and force down prices. Nothing indicates that Plaintiff's complaints about BBEK's position as a "monopoly" in the Detroit residential abatement market were based on allegations of illegal or unethical conduct. Instead, Plaintiff's comments, focused on the need to entice more abatement contractors to participate in the program, would have primarily benefited Den-Man and their fellow general contractors by lowering their costs and speeding the rate at which they could work. While hypothetically some of the savings from increased

competition may have inevitably flowed through to the City, it is readily apparent that the focus of Plaintiff's complaints was on his own interests, not those of the public at large. Consequently, the court must conclude that the primary focus of these stated grievances was Plaintiff's own self-interest as a city contractor.[1]

## 2. Adverse Action

When analyzing Defendants' motion to dismiss, this court previously determined that banning Plaintiff from the demolition program, based on allegedly protected speech, "squarely falls within the scope of adverse actions previously recognized by the Sixth Circuit." *MacDonald*, 434 F. Supp. 3d at 600. While the DLBA continues to contest this element, (*see* ECF No. 60, PageID.1665-67), the court declines to conduct a review at this stage because the court's holdings in favor of Defendants on both the "protect conduct" and "causation" elements, explained below, are sufficient to decide the case.

## 3. Causation

At the motion to dismiss stage, the court found that Plaintiff had sufficiently alleged a causal connection between the purportedly protected speech and Plaintiff being barred from working on city of Detroit demolition projects. *Id.* But the court noted that "[t]he timing between Plaintiff's criticisms of BBEK Environmental and Defendants' alleged retaliatory conduct will be relevant at the summary judgment stage." *Id.* Now that discovery has been completed, a more thorough analysis is possible. Conducting such an analysis, and assuming arguendo that Plaintiff's speech was protected, the

---

[1] The court stands by its previous conclusion "that critiquing the work of another contractor [does not appear to fall] within Plaintiff's 'official duties' as an employee of a private company," *MacDonald v. City of Detroit*, 434 F. Supp. 3d 587, 599 (E.D. Mich. 2020), but since it finds that content of the speech did not constitute a matter of public concern this fact does not help the Plaintiff.

court finds that he has failed to present enough evidence to raise a genuine issue of material fact regarding causation.

To satisfy the causation element of a first amendment retaliation claim, Plaintiff must demonstrate (1) that a defendant proximately caused the adverse action and (2) that a defendant was "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). The causal element requires Plaintiff to "point to specific, nonconclusory allegations reasonably linking [his] speech to. . . [the] discipline." *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (internal quotations and citations omitted). Plaintiff has failed to point to evidence sufficient to satisfy either prong.

First, as Defendants point out, this is not a case where the timing of an adverse action alone can support an inference of causation. Plaintiff stated in his deposition that he first began to voice concerns about BBEK in "June or July 2017." (ECF No. 61-3, PageID.1760.) And, Plaintiff states he regularly raised such concerns in weekly contractor meetings beginning in either January or February 2018, (ECF No. 70-4, PageID.2478), but the Health Department letter barring future work with the city was not issued until November 2018, (ECF No. 17-7, PageID.253).

"[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse. . . action" temporal proximity alone is not sufficient to establish causality but must be coupled "with other evidence of retaliatory conduct." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). In *Benison v. Ross*, the Sixth Circuit found that "a lag time of more than six months between protected conduct and an adverse action does not permit a strong causal inference." 765 F.3d

649, 661 (6th Cir. 2014). Since, at minimum, ten months had passed since DBA

employees first "learned" of Plaintiff's purportedly "protected activity" temporal proximity

alone does not support the required causation element. *See id.* Indeed, Plaintiff does

not appear to really contest this conclusion and now points to other circumstantial

evidence of retaliatory conduct he argues support causation. (*See* ECF No. 71,

PageID.2613.)

While it is true that different forms of circumstantial evidence "like the timing of

events or the disparate treatment of similarly situated individuals, is appropriate" when

supporting a retaliation claim, *see Thaddeus-X*, 175 F.3d at 399-400, the evidence

pointed to by the Plaintiff is not sufficient to establish a genuine issue of material fact.

Plaintiff's current arguments relying on circumstantial evidence fit into two main

categories. First, Plaintiff argues that "[t]here is clearly more to this story than what

defendants' witnesses are telling" because someone "must have had some animus

toward plaintiff in order to" get Dr. Khaldun to so quickly ban Plaintiff from City jobs

when the City's Health Department had never previously been involved in disciplining a

demolition contractor or "issued such a letter before or since." (ECF No. 71,

PageID.2616.) Second, Plaintiff alleges that his disparate treatment relative to Renee

Alter—his administrative assistant who handled demolition scheduling for Den-Man—

who was not punished at all for the improper Flanders street demolition is circumstantial

evidence supporting the idea that retaliatory animus actually motivated the ban. (*Id.* at

2614; ECF No. 70, PageID.2442.)

Plaintiff's first argument based on circumstantial evidence is conclusory and

based solely on conjecture. Plaintiff still does not know how Dr. Khaldun conducted her

17

investigation or the information on which she relied because he chose not to depose her or any other Detroit Health Department employee. (*See* ECF No. 70, PageID.2442.) While Plaintiff may have opted not to depose Dr. Khaldun for noble reasons, he cannot now construe the lack of developed information on this point as circumstantial evidence that something nefarious must have occurred. Furthermore, the deposition testimony of DBA executive Brian Farkas provides a succinct explanation for why Plaintiff was the first employee of a contractor to be banned from participation in the city's demolition program on public health grounds. Farkas explained that the DBA only recently changed its policies and began the practice of referring investigatory matters to the City Health Department following a 2017 "lead study." (ECF No. 61-6, PageID.1780.) Consequently, there is no genuine evidentiary dispute as to why employees of contractors were not subject to similar health department bans in the past.[2]

The evidentiary record shows that, from the perspective of the Detroit Health Department, Renee Alter should not be viewed as a direct comparator to Plaintiff. It is undisputed that while working at Den-Man, Plaintiff served as a "project manager" overseeing the contractor's work in the City of Detroit demolition program. (ECF No. 70, PageID.2428.) While Plaintiff testified that Ms. Alter, as an administrative assistant, did the day-to-day work of scheduling demolitions for his projects, he concedes that he served as her co-supervisor. (ECF No. 70-4, PageID.2477.) The initial investigatory

---

[2] The court also notes that Plaintiff's own complaint alleges that Kevin Woods who owned abatement subcontractor BBEK Environmental was later personally "banned" from participation in the demolition program "for falsifying Asbestos Clearance Reports." (ECF No. 17, PageID.165.) The record before the court does not indicate the legal mechanism through which Woods was barred from the program, but Plaintiff's claim in the present briefing that he was the only person to ever be personally banned from the demolition program, (*see* ECF No. 71, PageID.2615), is at best misleading.

report, which was provided to Dr. Khaldun, showed that David McDonald not Ms. Alter received the initial email from BBEK that listed "14444 Flanders" as "DO NOT WRECK." (ECF No. 17-6, PageID.237.) And the report stated that the owner of Den-Man, David Holman, laid blame for improper demolition at Plaintiff's feet. (*Id.* at 238 ("[Plaintiff] [sic] who was in charge of my demolition operation and scheduled this house on 9-13-18.").) While Plaintiff alleges that in reality "[o]n September 10, 2018, Holman transitioned Plaintiff's job responsibilities to Renee Alter" the report prepared by DBA on which Dr. Khaldun likely relied did not contain any indication of this fact. (ECF No. 17, PageID.166.) So, from the information possessed by Dr. Khaldun, there is no indication that Ms. Alter, an administrative assistant, would have appeared to be a direct comparator to a "project manager" like Plaintiff whose job title evinces broad responsibility for overseeing Den-Man's demolition work.[3] It is, therefore, unsurprising that Alter would not have received a similar punishment. While Plaintiff's evidence is likely sufficient to create a genuine dispute over whether he or Alter was actually responsible for the improper demolition, a dispute over whether Dr. Khaldun reached the wrong conclusion on who was at fault for the demolition does not establish that Dr. Khaldun was actually motivated by retaliatory intent or animus. Indeed, Plaintiff presents no evidence showing that Alter would have been treated differently if she had instead been found responsible.

---

[3] The undercurrent of Plaintiff's comparator claims appears to be that Dr. Khaldun should have conducted a more thorough investigation, including an interview of Plaintiff before issuing the letter banning his participation in the demolition program. But this is really a repackaging of a procedural due process claim which the court has already dismissed. *See MacDonald v. City of Detroit*, 434 F. Supp. 3d 587, 597 (E.D. Mich. 2020) ("Accordingly, both Plaintiff's procedural and substantive due process claims fail as a matter of law.").

In sum, Plaintiff has failed to present sufficient facts creating a triable issue—that his criticisms of a fellow contractor constituted protected conduct—nor has he demonstrated a jury question as to whether a causal connection exists between his speech and the decision to bar him from the DBA's demolition program. Consequently, Defendants must be awarded summary judgment as to Count III.

## IV. EQUAL PROTECTION CLAIM

Plaintiff also seeks to reinstate his equal protection claim that the court previously dismissed without prejudice. The court earlier explained that:

> The equal protection clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). Under the equal protection clause, "states cannot make distinctions which either [ (1) ] burden a fundamental right, [ (2) ] target a suspect class, or [ (3) ] intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). In his response, Plaintiff clarifies that his equal protection claim falls under the third category; intentionally treating one differently from others similarly situated. Plaintiff. . . is proceeding under a "class-of-one" theory.
> 
>  "[A] plaintiff must overcome a 'heavy burden' to prevail based on the class-of-one theory. *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012). "[T]he Supreme Court has recognized that a 'class-of-one' may bring an equal protection claim where the plaintiff alleges that: (1) he or 'she has been intentionally treated differently from others similarly situated'; and (2) 'there is no rational basis for the difference in treatment.'" *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). Plaintiff must allege that he was similarly situated to comparators in "in all material respects." *Loesel*, 692 F.3d at 462.

*Id.* at 597-98.

The court dismissed Plaintiff's claim because "Plaintiff [had] not sufficiently alleged the existence of a comparator" and failed to allege that the government's actions lacked a legitimate purpose "or demonstrate that the actions were motivated by

animus or ill-will." *McDonald*, 434 F.Supp.3d at 598 (quotations omitted). Plaintiff seeks permission to amend his complaint for a second time in order to revive his equal protection claim. (*See* ECF No. 62.)

## A. Standard of Review

"[A] proposed amendment is futile. . . if it could not withstand a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.,* 203 F.3d 417, 421 (6th Cir. 2000). Under Federal Rule of Civil Procedure 12(b)(6), the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pleaded factual allegations as true. *Barber v. Miller*, 809 F.3d 840, 843 (6th Cir. 2015). A complaint must provide sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012)

(emphasis removed) (citing *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

In reviewing a motion to dismiss, the court may consider "any exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## B. Discussion

Plaintiff's motion to amend attempts to address the shortcomings in his pleadings that were previously highlighted by the court. (*See* ECF No. 62.) Plaintiff first points to five instances between 2016 and 2019 where "contractors demolished properties within the City of Detroit without doing asbestos abatement," and he alleges that "[n]one of the above contractors, or individuals who were employed by those contractors, were barred from the demolition program." (*Id.* at PageID.1813-14.) Plaintiff's brief argues that employees of these contractors should be viewed as comparators who received different treatment. (*Id.*) Plaintiff also points to Renee Alter as a comparator, who despite her involvement in the improper Flanders demolition, was never formally punished by any of the Defendants. At the end of his brief in support of this motion, Plaintiff tersely states that "there appears to be no rational basis for this disparate treatment [relative to the comparators]." (*Id.* at 1821.)

22

Defendants all oppose Plaintiff's request to amend his complaint. (*See* ECF Nos. 67, 68, 69.) Defendants first argue that Plaintiff caused undue prejudice when he waited until a month after the close of discovery to amend the complaint. (ECF No. 69, PageID.2400-01.) Defendants also attack the substance of the amended complaint by arguing that Plaintiff has both failed (1) "to identify a comparator similarly situated in all material aspects" and (2) failed "to negate every conceivable rational basis for the City's conduct." (*Id.* at 2380-85.)

The court need not delve into all these arguments because in his new motion to amend Plaintiff has again failed to make a serious attempt at pleading that Plaintiff's ban "lacks a rational basis either by [negating] every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill-will." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty., Ohio*, 430 F.3d 783, 788 (6th Cir. 2005). Instead, in his reply, Plaintiff argues that he does not need to go through the work of negating every conceivable rational basis because "there can be no rational basis" for banning Plaintiff as an individual from the demolition program, "as neither the City nor its agents have a legal right to take [the] action." (ECF No. 74, PageID.2975.) He asserts that "the City of Detroit's own Law Department actually disagrees with the decision to bar plaintiff from the program." (ECF No. 75, PageID.2996.) Plaintiff notes that the "City of Detroit's Office of the Inspector General" had previously determined that another Den-Man employee—who allegedly physically threatened and used a racial slur against DBA officials—could not, as an "individual," be banned from doing business with the City of Detroit under its "1984 Debarment Ordinance." (*See* ECF No. 75-3, PageID.3011-12 ("In sum, the Office of the Inspector

23

General has authority to conduct an investigation of any matter as necessary to ensure compliance with the law. However, an employee, as an individual, may not be debarred from doing business with the City of Detroit.").) Plaintiff asserts "there can be no rational basis" for disregarding the law and personally "debar[ing] [Plaintiff] from doing business with the City of Detroit." (ECF No. 75, PageID.2997.)

Such an argument is a logical non sequitur. The court sees no reason that the Office of Inspector General's opinion on the application of the "1984 Detroit City Code of the Debarment Ordinance" to an individual who had engaged inappropriate/harassing speech, is in any way determinative of the Health Department's authority under the Health Code to punish individuals who have allegedly engaged in conduct that endangered the health of City residents. (*See* ECF No. 75-3, PageID.3011-12.) Dr. Khaldun's letter explicitly cited the city health code, not the debarment ordinance, as the source of her authority.  (ECF No. 17-7, PageID.253 ("Accordingly, pursuant to my authority to issue 'rules and policies necessary for enforcement' of any laws pertaining to 'public health and safety' (*see* Detroit City code 24-1-1.2), I am hereby declaring that it is the policy of the City of Detroit Health Department that no demolition within the City limits shall be conducted by any company, firm, or LLC that employs Mr. David MacDonald. . .").) The court need not engage in analysis of Dr. Khaldun's authority under the City's Health Code to conclude that the legal opinion cited by Plaintiff—analyzing a completely different ordinance—is almost certainly irrelevant to the legality of Dr. Khaldun's actions.

The irrelevance of the 1984 Debarment Ordinance is further illustrated by facts pleaded in Plaintiff's own complaint. After all, Plaintiff explicitly alleges that another

24

person, Kevin Woods, the owner of BBEK Environmental, was subsequently banned

from participating in the City's demolition program. (*See* ECF No. 17, PageID.165

("Kevin Woods has subsequently been banned from the DDP for falsifying Asbestos

Clearance Reports").) If other individuals, like Woods, have been barred from

participation in the City's demolition program because of health and safety violations it

seems especially unlikely that Plaintiff can support a claim that he was uniquely

targeted with a punishment that was illegal for the city to implement. In sum, Plaintiff's

reliance on the Inspector General's ruling, regarding a different ordinance, to allege

illegality of Dr. Khaldun's conduct is inadequate.

To properly allege that "the adverse treatment [Plaintiff] experienced was so

unrelated to the achievement of any combination of legitimate purposes that the court

can only conclude that the government's actions were irrational[,]" Plaintiff must either

"negate every conceivable reason for the government's actions or [demonstrate] that the

actions were motivated by animus or ill-will." *Rondigo, L.L.C. v. Twp. of Richmond*, 641

F.3d 673, 682 (6th Cir. 2011) (reversing Rule 12(b)(6) dismissal of the plaintiff's equal

protection claim under a class-of-one theory). The court previously rejected Plaintiff's

equal protection claim since "[n]either the complaint or Plaintiff's responses make this

required, affirmative showing." *MacDonald*, 434 F. Supp. 3d at 598.

> The November 6, 2018 letter states that "[t]he demolition of homes that have not
> undergone proper abatement poses health and safety risks" and that "[s]uch
> demolitions could also violate legal frameworks[.] (ECF No. 17-7.) Plaintiff offers
> no arguments to refute this cited justification for the policy, nor does he
> sufficiently allege that Defendants' actions were motivated by ill will or animus.

*Id.* Plaintiff's current attempt at amending the complaint once again falls short in this

respect. Because Plaintiff chose to rely on a conclusory legal theory based on the city's

1984 Debarment Ordinance instead of trying to "negate every conceivable reason for

the government's actions or [demonstrate] that the actions were motivated by animus or ill-will" the court must conclude that the latest attempt at amending the complaint is also futile as it would not survive a Federal Rule of Civil Procedure 12(B)(6) motion to dismiss. *See Rondigo, L.L.C.*, 641 F.3d at 682. Plaintiff's motion to amend is therefore denied.

## V. CONCLUSION

The court finds as a matter of law that Plaintiff's criticisms of fellow contractor BBEK Environmental, as revealed through discovery, did not constitute protected conduct addressing a matter of public concern. Even if Plaintiff's complaints were deemed protected speech, however, the court finds the circumstantial evidence presented by Plaintiff was insufficient to create a genuine factual dispute regarding causation. Finally, Plaintiff's proposed amended equal protection claim, Count II, still fails to properly plead all the required elements for a "class of one" equal protection claim. Thus, Defendants are entitled to summary judgment on Count III and that Plaintiff's motion to amend Count II of his complaint must be denied. Accordingly,

IT IS ORDERED that Defendants' Motions for Summary Judgment (ECF Nos. 60, 63, 64) are GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion to File an Amended Complaint (ECF No. 62) is DENIED.

Inasmuch as all claims have not been resolved, the court will issue a separate

judgment in favor of Defendants.


s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  February 1, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 1, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\AAB\Opinions and Orders\Civil\19-12183.MCDONALD.msj.AAB.RHC.2.docx

27